**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STRATEGIC BUSINESS PARTNERS, LLC, an Illinois limited liability company, and 1st TIER PROFITABILITY GROUP, LLC, an Illinois limited liability company, | ) ) ) ) ) | FILED: JUNE 19, 2008
08CV3515
JUDGE KENDALL
MAGISTRATE JUDGE VALDEZ |
| Plaintiffs, | ) | **Case No.** |
| -vs- | ) ) | TC |
| THOMAS C. SOURAN, | ) ) | |
| Defendant. | ) | |

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiffs Strategic Business Partners, LLC and 1st Tier Profitability Group, LLC, for their complaint against Defendants Thomas C. Souran state as follows:

**INTRODUCTION**

1. This action is brought to address Defendant Thomas C. Souran's breaches of his post-employment agreement, his tortious interference with Plaintiffs' business relations, his deceptive business trade practices, and his defamation of Plaintiffs. Plaintiffs seek damages and injunctive relief against Defendant Souran.

**THE PARTIES**

2. Plaintiff Strategic Business Partners, LLC ("SBP") is a limited liability company organized under the laws of Illinois, with its principal place of business in Arlington Heights, Illinois, and is in the business of, among other things, providing consulting on business processes and operational and financial management to companies and businesses. SBP is an affiliate and sister company of Plaintiff 1st Tier Profitability Group, LLC.

3. Plaintiff 1st Tier Profitability Group LLC ("1st Tier") is a limited liability company organized under the laws of Illinois, with its principal place of business in Arlington Heights, Illinois. 1st Tier is an affiliate and sister company of SBP, and until December 2007, was engaged in the business of, among other things, providing consulting on business processes and operational and financial management to companies and businesses.

4. Defendant Thomas C. Souran ("Mr. Souran") is a citizen of Texas, who worked as a Business Analyst and Financial Specialist for SBP and 1st Tier between May 30, 2007 and August 5, 2007.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332(a) by virtue of diversity of citizenship; the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the claims occurred in Illinois and because Plaintiffs suffered economic and reputational injury in Illinois.

6. Mr. Souran has consented to the jurisdiction of and venue in this Court under Paragraph 8 of the Agreement and General Release between 1st Tier and Mr. Souran ("Agreement"). (Plaintiffs will seek leave to file a true and correct copy of the Agreement as an exhibit to this Complaint under seal.) Jurisdiction is also proper over Mr. Souran because he intentionally and maliciously published false, misleading, defamatory and disparaging statements about SBP and its principals' integrity and business practices, services and/or products on the World Wide Web to third parties in Illinois, knowingly causing harm in Illinois, and because he intentionally sent a link to a website containing certain defamatory and disparaging statements

described in this complaint, souranvsbpsolutions.com, to SBP principals and others working for SBP located in Illinois.

## BACKGROUND FACTS

**1st Tier Hires Mr. Souran**

7.      SBP is a limited liability company which provides strategic analysis and evaluation, planning, and other consulting services to companies and businesses facing financial difficulties through a proprietary copyrighted system of management processes. Its clients are located nationwide.

8.      1st Tier, SBP's affiliate and sister company, is a limited liability company which formerly provided strategic analysis and evaluation, planning, and other consulting services to a niche market of privately owned companies facing financial difficulties through a proprietary copyrighted system of management processes.

9.      In or around May 2007 Charles Orabutt (SBP President and Chief Executive Officer), Ronald W. Bridges (then Managing Director of 1st Tier and current Chief Operating Officer of SBP), and Dan Hostetler (then Vice President of 1st Tier and current Vice President of SBP) interviewed Mr. Souran for a position at SBP.

10.     During the interview and on multiple occasions thereafter, Mr. Souran indicated that he was an experienced business analyst and sales executive. Mr. Souran represented that he had previously worked as an executive for International Profit Associates, a competitor of 1st Tier and SBP, from 1992 through 2000, and that he had been employed on more than one occasion by George S. May International Company, another competitor of 1st Tier and SBP. Mr. Souran also represented that he was currently a licensed registered commodities broker through the National Futures Association, a regulatory body which governs futures trading, and was

licensed by the Securities and Exchange Commission ("SEC"), allowing him to assist companies in planning public offerings of stock and/or raising funds in private offerings of stock.

11. SBP decided to hire Mr. Souran as a Business Analyst and Financial Specialist. Mr. Souran commenced working at SBP Tier on May 30, 2007. On or about July 3, 2007, Mr. Souran was transferred from SBP to 1st Tier. Under 1st Tier policy, the first 90 days of employment are a probationary period.

**1st Tier's Termination of Mr. Souran's Employment**

12. During the course of Mr. Souran's employment, Mr. Souran spent significant time conducting personal business while on company time.

13. In addition, while working on behalf of 1st Tier, Mr. Souran compiled a draft business and equity offering plan for a 1st Tier client.

14. In the course of preparing this equity plan, Mr. Souran informed Mr. Bridges that he and Mr. Bridges could receive substantial placement and commission fees if they selected a particular funding group to provide funding for the public offering. He also stated that he and Mr. Bridges could obtain these fees for themselves, without making 1st Tier or SBP a party to the placement of the funding with that group. Mr. Bridges immediately refused and reported Mr. Souran's suggestion to SBP's ownership.

15. For these and other reasons, 1st Tier decided to terminate Mr. Souran's probationary employment.

16. On August 5, 2007, Mr. Orabutt and Mr. Hostetler, with Mr. Bridges present, met with Mr. Souran to terminate his employment.

**1st Tier Enters into a Post-Termination Contract with Mr. Souran**

17. On or around August 13, 2007, SBP discovered that Mr. Souran had published certain false, misleading and defamatory comments about SBP and its owners and executives on a website entitled "Ripoff Report.com" (http://www.ripoffreport.com/).

18. Specifically, the website posting stated that SBP had "questionable business practices" and that SBP fired Mr. Souran "once he questioned there (*sic*) business practices." Each of these statements—including Mr. Souran's implication that he had questioned SBP practices while employed—is false.

19. The posting also stated that Mr. Bridges had "a multi million dollar lawsuit against him for ripping off his partners and still owes $450K" and that "[t]hese people" come from "International Profit Associates and George S. May." With the exception of the fact that Mr. Bridges and Mr. Hostetler had formerly worked for George S. May International Company, each of these statements is false.

20. The posting also stated that SBP "refused to pay [Mr. Souran] the monies [Mr. Souran] was owed." This statement is false.

21. On August 17, 2007, Mr. Orabutt and Mr. Souran executed the Agreement, whereby Mr. Souran agreed, among other covenants:

(a) To refrain from making or posting any comment in any public forum, including but not limited to any internet website, web log, chat room or print media, concerning 1st Tier or any affiliate of 1st Tier including SBP and its employees, or Mr. Bridges, for a three-year period, without written approval of 1st Tier management (Agreement, Paragraph 5);

(b) To refrain from making any oral or written comments which defame or denigrate 1st Tier, SBP or their employees (Agreement, Paragraph 9);

    (c)  To refrain from contacting any current employee of 1st Tier or SBP, without first informing 1st Tier's CEO, for a period of two years (Agreement, Paragraph 9); and

    (d)  To refrain from contacting any client or prospective client of 1st Tier or SBP for a period of three years (Agreement, Paragraph 9).

  22.  Paragraph 10 of the Agreement provides that a material breach of Paragraphs 5 or 9 will result in "irreparable harm" to the non-breaching party, and that the non-breaching party will be entitled to preliminary and permanent injunctive relief, prohibiting further breach, in addition to any rights or remedies to which the non-breaching party may be entitled, and costs and expenses including all attorneys' fees (Agreement, Paragraph 10).

  23.  SBP is a third-party beneficiary of the Agreement. (Agreement, Paragraphs 5, 9).

  24.  In consideration of these and other promises set forth in the Agreement, 1st Tier made a payment to Mr. Souran, which payment Mr. Souran accepted.

**Mr. Souran's Post-Agreement Activities**

  25.  On information and belief, a few weeks after the parties entered the Agreement, Mr. Souran contacted two clients of 1st Tier, referenced herein as "Company A" and "Company B," and made false, defaming and denigrating comments about SBP and its work product and/or services, and about certain 1st Tier and/or SBP officers.

  26.  On information and belief, Mr. Souran told a representative of Company A that 1st Tier had not performed its obligations under its contract with Company A, even though 1st Tier had billed Company A for its services.

  27.  Specifically, on information and belief, Mr. Souran told the representative of Company A that 1st Tier had breached its contractual obligations in that, based on where 1st Tier was in the project and the amounts that Company A had paid, 1st Tier should have already prepared and provided an Operations Manual for Company A. Mr. Souran's statements were

false because the Operations Manual was not to be prepared until later in the project and was not to be provided until the project was completed. Thus, the Operations Manual was not due and had not yet been paid for.

28.  On information and belief, Mr. Souran directed representatives of Company A to his August 13, 2007 posting on RipoffReport.com.

29.  On information and belief, Mr. Souran also told the representative of Company A, one of 1st Tier's largest clients, that Company A had no obligation to and should not pay its outstanding balance of $45,000.00 until 1st Tier performed further services. This statement was false.

30.  On information and belief, Mr. Souran also encouraged the representative of Company A to terminate its contract with 1st Tier.

31.  Company A's representative thereafter informed Mr. Bridges that it had no intention of paying its outstanding balance, and would reconsider only if 1st Tier provided the additional services Mr. Souran referenced.

32.  On information and belief, Mr. Souran contacted Company A with the objective of continuing to develop a financing plan with Company A and to do work that Souran knew to be covered by 1st Tier's contract with Company A.

33.  In order to salvage the client relationship and obtain a favorable reference from that client, and to recover the $45,000.00 owed by Company A, 1st Tier performed the remaining $47,000.00 of services contemplated by the contract, plus additional services valued at $134,00.00. To date, Company B has not paid any portion of this $226,000.00 in services.

7

34. On information and belief, Mr. Souran told a representative of Company B that 1st Tier had not performed its obligations under its contract with Company B, even though it had billed Company B for its services.

35. Specifically, on information and belief, Mr. Souran told the representative of Company B that 1st Tier had wrongfully failed to provide an Operations Manual and certain reporting systems for Company B. Mr. Souran's statements were false because the Operations Manual was not to be prepared until later in the project and was not to be provided until the project was completed, and the reporting systems were not contemplated by the contract. Thus, the Operations Manual was not due and neither the Operations Manual nor the reporting systems had been paid for.

36. On information and belief, after his termination, Souran performed services for Company B that were, and that Souran knew to be, covered by the contract.

37. On information and belief, Mr. Souran directed representatives of Company B to his August 13, 2007 posting on RipoffReport.com.

38. On information and belief, Mr. Souran also told the representative of Company B that Company B had no obligation to and should not pay its outstanding balance of $16,700.00 until 1st Tier performed these obligations under its contract with Company B.  This statement was false.

39. Company B's representative thereafter informed the company that it would not pay its outstanding balance.

40. In order to salvage the client relationship and obtain a favorable reference from that client, and to recover the $16,700.00 owed by Company B, 1st Tier performed the remaining

$23,500.00 of services contemplated by the contract, plus additional services valued at $18,200.00. To date, Company B has not paid any portion of this $58,400.00 in services.

**SBP Posts Defense on RipoffReport.com, and Mr. Souran Responds**

41.     Because RipoffReport.com generally does not remove postings, Mr. Souran's August 13, 2007 posting remained on the RipoffReport.com website.

42.     Several prospective candidates for employment at SBP expressed concern about working for SBP, citing the contents of Mr. Souran's August 13, 2007 posting on RipoffReport.com.

43.     On information and belief, at least two SBP clients saw and were concerned about the statements on the August 13, 2008 posting.

44.     To assuage these perceived and expressed concerns and to discredit the posting's accuracy and content, on April 24, 2008, SBP posted a defense on RipoffReport.com, in which it stated, among other things, that Mr. Souran's comments were baseless, without merit, and constituted an impugning of SBP's recognized position in the market.

45.     SBP posted the defense on its own behalf, at the direction of SBP's Board of Directors.

46.     On May 8, 2008, Mr. Souran posted a response to SBP's posting, entitled "*SBP and Ron Bridges Your Time is Coming.*" In this second posting, Souran stated that SBP's response "is all full of lies." He also threatened that he would be "going after each owner of SBP" and that he would be creating a web site to host the "pleadings, discovery and backgrounds of the owners and employees of SBP." This posting in effect republished the August 13, 2007 posting.

47.     Mr. Souran has emailed a link to his website, souranvsbpsolutions.com, to James Talerico, SBP's Vice President of Reengineering Services, a Texas resident, as well as to Mr.

9

Orabutt, Mr. Hostetler, and Charles Wilkinson, SBP's Administrator to the Chief Operating Officer, each of whom is an Illinois resident.

48. Souranvsbpsolutions.com purports to have information on the "backgrounds" of three of the four Senior Executives of SBP, as well as about Mr. Talerico, and contained false, denigrating and defamatory comments about SBP, its business and services, and its principals and employees.

49. Specifically, souranvsbpsolutions.com includes a statement that Mr. Bridges, SBP's Chief Operating Officer, "bankrupted a company." This statement was false and defamed and denigrated SBP and its products and services, as SBP, through its agents and principals, consults and advises companies facing financial difficulties.

50. Souranvsbpsolutions.com also includes a statement that Mr. Bridges "converted all forms from PDP Group LLC and utilizes them in his current operations." This statement was false and defamed and denigrated SBP and its products and services.

51. Souranvsbpsolutions.com also states: "I would seriously consider to ask for 'real' recommendations on projects that are both complete and have terminated early. I would talk to each of the references and ask if they got real value for the money that they paid. Then talk to the clients who terminated the project early to find out the real answers of why the project ended early....." It then purported to list five "former clients of Ron Bridges" to call as references—none of which listed companies was ever a client of 1st Tier, SBP, or Mr. Bridges. These statements defamed and denigrated SBP in that they wrongly suggested that the named companies terminated projects with 1st Tier, SBP or Mr. Bridges early and wrongly suggested that such entities would speak negatively regarding Mr. Bridges and those companies with whom he is associated.

52. On information and belief, the account for the website souranvsbpsolutions.com was suspended on or around June 13, 2008, for lack of payment, but was reinstated on or around June 19, 2008.

## COUNT I: BREACH OF CONTRACT
### (SBP and First Tier)

53. SBP and 1st Tier incorporate and restate Paragraphs 1 through 52 above as if fully set forth herein.

54. Defendant Mr. Souran had a valid and binding contract with 1st Tier, the Agreement, of which contract SBP was a third-party beneficiary. 1st Tier complied with its obligations under the Agreement. SBP had no obligations under the Agreement.

55. Mr. Souran has breached the contract by engaging in the conduct described above, including, but not limited to: making comments about SBP and its officers and employees on the website souranvsbpsolutions.com; making oral statements which defame and denigrate 1st Tier, SBP, and its officers employees; contacting clients of 1st Tier or SBP; and contacting employees of 1st Tier or SBP.

56. Paragraph 10 of the Agreement provides that a material breach of Paragraphs 5 or 9 will result in "irreparable harm" to the non-breaching party, and that the non-breaching party will be entitled to preliminary and permanent injunctive relief, prohibiting further breach, in addition to any rights or remedies to which the non-breaching party may be entitled, and costs and expenses including all attorneys' fees. (Agreement, Paragraph 10.)

57. As a direct and proximate result of Mr. Souran's breaches of contract, 1st Tier and SBP have suffered and will continue to suffer great injury and damage, in an amount in excess of $75,000.00 to be proven at trial.

## COUNT II: TORTIOUS INTERFERENCE WITH EXISTING BUSINESS RELATIONSHIPS
### (1st Tier)

58. 1st Tier incorporates and restates Paragraphs 1 through 52 above as if fully set forth herein.

59. As described in Paragraphs 25 through 40, 1st Tier had existing business contracts for services with at least two clients who, upon information and belief, Mr. Souran contacted, and to whom Mr. Souran, upon information and belief, made false, defamatory and denigrating statements about SBP, 1st Tier and its officers and/or employees, and their products and services.

60. Upon information and belief, Mr. Souran encouraged these two clients to terminate their contracts with 1st Tier and to allow him to finish the projects, instead of 1st Tier.

61. Mr. Souran knew that 1st Tier had existing business relationships with these clients.

62. Mr. Souran intentionally and unjustifiably interfered with 1st Tier's business relationships by making false, defamatory and denigrating statements about SBP, 1st Tier and its officers and/or employees and their services, by instructing them that they should not pay their outstanding invoices, and by encouraging them to terminate their contracts with 1st Tier.

63. Mr. Souran's statements induced those clients to refrain from paying outstanding invoices for services and induced them to demand further services, for which they did not pay.

64. As a result of Mr. Souran's knowing and intentional interference with their existing business relations, 1st Tier lost business revenues in excess of $75,000.00, and were required to expend additional time and resources to remedy the damaged relationships with these two clients.

**COUNT III: VIOLATION OF THE UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(1st Tier and SBP)**

65. 1st Tier incorporates and restates Paragraphs 1 through 52 above as if fully set forth herein.

66. Section 2 of the Uniform Deceptive Trade Practices Act ("UDTPA"), which is codified in Illinois at 815 ILCS 510/1, *et seq.,* provides, among other things, that a "person engages in a deceptive trade practice when, in the course of his business, vocation or occupation", the person "disparages the goods, services or business of another by false or misleading representation of fact." 815 ILCS *5* 10/2(8). The UDTPA explicitly provides for injunctive relief and, if the defendant's actions are willful, an award of attorneys' fees and costs pursuant to 815 ILCS 510/3.

67. As set forth in Paragraphs 27, 28, 29, 35, 37, 38, 47, 49, 50 and 51 Mr. Souran violated the UDTPA by willfully making false and disparaging statements of fact about SBP's business or services to, on information and belief, at least two clients, and on the website souranvsbpsolutions.com.

68. Defendant's unfair and deceptive trade and business practices impact upon and have damaged SBP.

**COUNT IV: DEFAMATION PER SE**
**(1st Tier and SBP)**

69. 1st Tier and SBP incorporate and restate Paragraphs 1 through 51 above as if fully set forth herein.

70. As set forth in Paragraphs 18, 19, 20, 27, 28, 35, 37, 49 and 50 Mr. Souran made false statements about SBP that are defamatory *per* se in that they impute a lack of ability on the part of SBP and/or 1st Tier in their profession and business.

13

71. These defamatory statements were communicated to third parties, through personal communications, via the website souranvsbpsolutions.com, and via emails and other communications directing third parties to that website.

72. Mr. Souran made these statements with knowledge that they were false, or with reckless disregard for whether they were true or false, or with no reasonable basis for believing that the statements were true.

73. The defamatory statements were made maliciously, without justification, and with intent to injure 1st Tier and SBP.

74. Because of these defamatory statements, 1st Tier and SBP's reputations have been damaged.

### COUNT V: DEFAMATION PER QUOD
### (1st Tier)

75. 1st Tier incorporates and restates Paragraphs 1 through 51 above as if fully set forth herein.

76. As set forth in Paragraphs 27, 28, 29, 35, 37 and 38, Mr. Souran made false statements about 1st Tier that were defamatory.

77. These defamatory statements were communicated to third parties, through personal communications.

78. Mr. Souran made these statements with knowledge that they were false, or with reckless disregard for whether they were true or false, or with no reasonable basis for believing that the statements were true.

79. The defamatory statements were made maliciously, without justification, and with intent to injure 1st Tier.

80. Because of these defamatory statements, 1st Tier suffered special damages of at least $226,000.00 with respect to Company A and at least $58,400.00 with respect to Company B, plus other damages to be proven at trial.

### PRAYER FOR RELIEF

**WHEREFORE** Plaintiffs 1st Tier and SBP request the following relief:

(a) an injunction requiring Mr. Souran to comply with his obligations under the Agreement, requiring Mr. Souran to remove the website souranvsbpsolutions.com and prohibiting him from reposting the content posted on souranvsbpsolutions.com elsewhere, requiring Mr. Souran to refrain from creating, posting or registering any other website or other posting via the World Wide Web regarding or discussing 1st Tier, SBP, its affiliates, officers and employees, and requiring Mr. Souran to post a retraction on RipoffReport.com, in a form approved of by Plaintiffs;

(b) an award of money damages to be proven at trial adequate to compensate for the damage caused by Mr. Souran's unlawful acts;

(c) disgorgement of the amounts paid to Mr. Souran in consideration for his acceptance of the Agreement;

(d) an award of punitive and exemplary damages;

(e) an award of the plaintiffs' attorneys' fees and the costs of this action; and

(f) such other relief as the Court deems just and proper.

Dated:  June 19, 2008

    /s/    Laura B. Friedel
Max G. Brittain, Jr. (ARDC # 297941)
Laura B. Friedel (ARDC # 6256841)
Nora Kersten Walsh (ARDC # 6277774)
SCHIFF HARDIN LLP
6600 Sears Tower

        Chicago, Illinois  60606
        (312) 258-5500

*Attorneys for Plaintiffs Strategic Business Partners LLC and 1st Tier Profitability Group LLC*

CH1\5825576.3